WINDOW ROCK DISTRICT COURT

January 21, 1983

No. WR-CV-01-83

MONICA DAMON, EDITH YAZZIE, REBECCA MIKE,
and ELEANOR WAUNEKA, PLaintiff, v.

PETER MacDONALD, FRANK E. PAUL, ROY KEETO,
JOHN DOES 2, 3 and 4; ADVISORY COMMITTEE, NAVAJO
TRIBAL COUNCIL, NAVAJO TRIBAL COUNCIL;  and
CONTROLLER OF THE NAVAJO TRIBE, Defendants.

Honorable Tom Tso, Judge presiding.

THE FACTS ON RECORD

        This law suit comes to the court as a simple dispute between private individuals over who has the right to use lands owned by the Navajo Nation. It is brought to quiet title to lands which are the subject of separate and conflicting claims.  However the suit is more complex because the parties, and one plaintiff who is a member of the Navajo Tribal Council, contend that certain legislative actions of the Advisory Committee were illegal.
        The basic facts of the dispute are simple.  The plaintiffs claim that in 1967 a gentleman by the name of George Damon established a customary use area in what is now the community of Window Rock, and that the customary use Mr. Damon had was a property interest which he could hold and which his wife and children could inherit.  The plaintiffs in this action are the widow and daughters of George Damon, claiming rights to the land through him and the Damon family.
        Things became complicated when a gentleman by the name of Nakai Nez put his thumb print to an agreement dated November 8, 1935.  That agreement says Nakai Nez held for 20 years through "usage," and that Nez would give up "a strip of land lying between the Agency buildings and the Cap Rock of the mesa on the East, and the lands formerly held by Carl Mute, Navajo Indian, on the North, and Charlie Yazzie and John Keto, Navajo Indians, on the South...."  In return for these 100 acres, Nez was to receive a farm wagon, a harness set and he could "haul ten cords of wood."
        The Damon family says that Nakai Nez was only living with the Damon family, with the implication he had no right to relinquish the 100 acres.  In any event the Damons say that there was never a consent on their part to give up their customary use area.  That assertion is somewhat clouded by the inconsistent fact that the decedent and seven of his children have held grazing permits in the area, the children having theirs in the years following 1968.
        There is some dispute, as yet unclear, as to exactly what the relevance is of the surrender of the 100 acres by Nakai Nez, including

his right to make a surrender and the precise location of the land. The land description contained in the 1935 agreement can by no stretch of the imagination be said to be legally precise.

Things began coming to life when the Acting Area Director of the Navajo Area Office (Bureau of Indian Affairs) notified the Chairman of the Navajo Tribal Council on December 16, 1982 that a certain "administrative reserve" of 100 acres, located in the Window Rock area, was restored to tribal trust land status. Very shortly thereafter defendant MacDonald accepted the return of the land on behalf of the Navajo Tribe.

On December 29, 1982 the Office of Navajo Land Development entered into a compromise of dispute agreement with five individuals regarding the disputed area, but that agreement did not include the plaintiffs.

Previously the Advisory Committee approved the withdrawal of the land in dispute (December 17, 1982), and on December 28, 1982 the day before the compromise agreement was signed - the expenditure of $70,000 to settle the claims of Willie Keeto and others was approved by it.

Subsequently defendants MacDonald, Paul and Keeto received Advisory Committee approval for homesite leases in the area. It has appeared to the court that the Advisory Committee resolution with respect to defendant MacDonald's homesite has been approved by the Bureau of Indian Affairs, but that those of defendants Paul and Keeto have not, and the Bureau will withhold action until the rights of all the parties to this case are resolved. Defendant MacDonald has already been removed as a subject of temporary relief by Bureau action.

The plaintiffs ask for a temporary restraining order to stop construction on the land, prevent further decisions on the land until compensation is paid, to halt financial transactions connected with these events, to prevent the use of tribal employees, equipment and materials in developing the land, and to otherwise freeze action until the case is decided. Plaintiff Edith Yazzie asks this relief not only on her own behalf as a claimant, but on behalf of the Navajo public.

STANDARDS FOR TEMPORARY RESTRAINING ORDERS

Temporary restraining orders are meant to be short-lived, and they can be granted only until the court can hear the matter in more detail in a later hearing for relief while the suit is pending. Weintraub v. Hanrahan, 435 F.2d 461 (CA7, 1970). What a plaintiff asks for when requesting a temporary restraining order is something drastic and something the court usually will not grant, unless there is a very strong showing indeed that there will be an injury which cannot be later healed and that it is desirable for such action to be taken. Youngstown Sheet & Tube Co. v. Sawyer, 103 F. Supp. 978 (D.D.C. 1952). Before a court can grant a temporary restraining order, it must be satisfied that:

> 1. There is going to be immediate and irreparable injury;
> 2. There is a probability of success on the merits; and
> 3. There is harm to the moving party which outweighs any harm to the opposing party and to the public. National Prisoners Reform Asso. v. Sharkey, 347 F. Supp. 1234 (D.R.I. 1972).

## THE LAW IN THIS CASE

These are very high standards, and this court has already turned down the plaintiffs' request for a temporary restraining order for their failure to present compelling facts showing they are entitled to relief.

A lengthy hearing was held on the plaintiffs' application, and the court had the opportunity to hear live testimony and receive documents in support of the application. The factual conclusion of this court is that there is something to the plaintiffs' claims but not enough to merit the entry of a temporary restraining order. Very serious questions of fact and law have been raised, but there is not enough at this point to justify drastic action by the court.

The Court is not convinced there will be immediate and irreparable injury because, while the plaintiffs point out that the grazing use of the land will be destroyed, there is no strong showing they actually use it to graze. Their claim for specific relief is also clouded by their claims for monetary payment, and the law for centuries has been that a court will not stop someone from doing something if a money payment to an injured party will resolve his problem. There is also the fact that on January 12, 1983 letters were sent to Frank E. Paul, Willie Keeto and Roy Keeto saying it will not act on resolutions affecting this matter "until all the rights of all the parties have been resolved by the Courts." Therefore there is in effect administrative hold which resolves some of the need. Further the defendants have already agreed, in their homesite lease application, that they will not build until all approvals are had.

There is not enough evidence before the court to show that the plaintiffs will probably succeed. The court needs clarification of the effect of the 1907 customary use claim, the impact of the 1935 agreement and the actions of the parties affecting their rights to the land. The court must also have a good deal more argument and law presented to it before deciding the validity or invalidity of actions by the Advisory Committee. This Court follows the presumption of validity that attaches to official acts, particularly those of the legislature, and it will not act hastily to invalidate an Advisory Committee resolution. This is not to say that the court will not invalidate an illegal act, but it must be clear that an act is illegal before the staying hand of the court is extended.

There has been no satisfactory showing of a harm to the plaintiffs which outweighs any harm to the opposing parties. If construction is halted, then the defendants could be in breach of building contract commitments, material purchase commitments and other obligations. This court notes that outgoing tribal officials will not have the advantage of tribal housing and that they will have to find other places to live. Defendant Paul has a sufficient risk of losing a great deal of money that the court does not find the wright of hurt to be light for him. Of course all this will depend upon Bureau of Indian Affairs action, and it has indicated it will withhold action until this matter is resolved.

The public concern is great in this case. Allegations of impropriety of public monies being spent and public lands being allocated without following proper procedures are serious, and the court has the public interest very much in mind. However, since the Bureau of Indian Affairs has not approved (and apparently will not approve) the expenditure of public monies, and land illegally vested can be legally

divested, the solution is to proceed to a full trial and resolve these questions. The court sees no irreparable injury to the public interest now, given the present state of things.

Since these points tell the court it should not issue a temporary restraining order, and since there has been evidence of restraint on the part of the Bureau of Indian Affairs, it is appropriate for the court to ask the Bureau, as the organ of one sovereign speaking to the organ of another, that it continue with its policy of withholding action on matters before it related to this case until the case here can be resolved. This is a matter falling under Navajo law and one within the jurisdiction of this court, and this court represents to the Bureau of Indian Affairs that this, and not the Bureau, is the more appropriate forum to resolve this dispute.

Since the Court is denying temporary relief, it is in the interests of justice that the plaintffs have a rapid opportunity to present their final case. Therefore the Court will enter a separate order for an expedited trial, rapid discovery and appropriate pretrial proceedings. If the case is tried and decided quickly, then many of the problems of possible injury to the plaintiffs will be resolved. Needless to say, the defendants would like to know where they stand as soon as possible.

Based on these considerations, the application for a temporary restraining order is DENIED, with leave for reapplication should there be a change in circumstances meriting relief.